## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| AMANDA NURSE,<br><br>         Plaintiff,<br>  v.<br><br>WINDHAM COMMUNITY MEMORIAL<br>HOSPITAL,<br><br>       Defendant. | 3:10-CV-00177 (CSH) |

## RULING ON DEFENDANT'S
## MOTION FOR SUMMARY JUDGMENT

**HAIGHT, Senior District Judge:**

**I.    Introduction**

This is an employment discrimination case.  Plaintiff Amanda Nurse (hereafter "Plaintiff" or "Nurse") accuses her former employer, Windham Community Memorial Hospital (hereafter "Defendant" or the "Hospital") of violating both the Connecticut Fair Employment Practices Act (hereafter the "CFEPA"), Conn. Gen. Stat. §§ 46a-51, *et seq.*, and the Family and Medical Leave Act (hereafter the "FMLA"), 29 U.S.C. §§ 2601, *et seq.*  Plaintiff asserts that Defendant interfered with Plaintiff's right to take leave for her disability, depression, under the FMLA; that Defendant retaliated against Plaintiff for having exercised her right to take such a leave; that Defendant terminated her employment due to her disability, and that Defendant unlawfully failed to accommodate this disability.

1

Defendant denies all liability, and now moves for summary judgment dismissing the Complaint.

## II.    Background

The following facts, for the most part undisputed and culled from the pleadings and exhibits thereto, are relevant to the current motion.

Plaintiff was employed as a medical laboratory technician (hereafter "MLT") by Windham Community Memorial Hospital from 2004 through October of 2008. In October of 2008, Plaintiff was terminated. Plaintiff's termination followed a series of errors concerning the testing of specimen samples, including the levels of medications in patients' blood, as well as incidents in which she displayed behavior of a sexual nature in the workplace. One such lab testing mistake resulted in a patient's severe internal bleeding. Other mistakes nearly cost the Hospital lab its accreditation. Plaintiff also forged a coworker's signature on a Hospital timecard. Plaintiff states that throughout her employment, she suffered from chronic depression, and further, that at least some individuals at the Hospital were aware of her condition, including a Hospital employee named Kim Ninteau who worked as Plaintiff's laboratory partner early in Plaintiff's tenure at the Hospital, later supervised Plaintiff, and was integral in the decision to terminate Plaintiff's employment in October of 2008.

In late June of 2008, Plaintiff commenced a leave of absence (i.e., a continuous FMLA leave) due to her depression. Her health care provider, Dr. Michael Keenan, informed the Hospital's Human Resources department of the nature of this leave of absence in FMLA-related paperwork, in which he noted both that Plaintiff suffered from depression and that her condition had worsened to the point at which her job performance was affected. Dr. Keenan also noted in this paperwork that Plaintiff was at that time unable to perform any work, and that in addition to her continuous FMLA

2

leave she might need to take intermittent FMLA leave for approximately three to four months due to her condition.  Plaintiff remained out of work on her continuous FMLA leave of absence until early August of 2008, when Dr. Keenan approved her return to work without restrictions.  Dr. Keenan made no mention of whether Plaintiff still required intermittent FMLA leave in the accompanying paperwork.

Shortly after her return to the Hospital, Plaintiff requested that she receive retraining in aspects of her job, which it appears she did not receive.  Plaintiff claims that, had she been provided such retraining, she would have been able to perform adequately in her position subsequent to her return from continuous FMLA leave.  Plaintiff also received a written warning for "excessive absenteeism" soon after her return from her FMLA leave of absence, as well as disciplinary warnings concerning her pre-continuous leave behavior.

In late September of 2008, less than two months after her return to full-time work, Plaintiff sought medical attention for "flu like" symptoms.  Dr. Keenan provided Plaintiff with a note stating that she would be out of work for two days due to what he termed "Lyme Disease."  Plaintiff provided this note to Defendant.  Plaintiff subsequently provided Defendant with a second note in which Dr. Keenan indicated that Plaintiff would be unable to return to work until after a follow-up doctor's visit, which was scheduled for three days thereafter.  Plaintiff returned to work on September 27, 2008, the day following her follow-up visit with Dr. Keenan.

On October 10, 2008, less  than a month later, Plaintiff was terminated from her position at the Hospital for four stated overarching reasons: (1) attendance and punctuality; (2) poor quality of work and performance; (3) falsification of records and timecard; and (4) inappropriate conduct. [Doc. 21-4] at 97.  Plaintiff was given at that time a detailed explanation, both in the form of two

bullet-pointed lists of specific offenses and an undated letter, explaining the Hospital's reasons for her termination.  Among the specific performance and behavioral issues that Defendant cited, all of which had occurred over the two years prior to Plaintiff's termination, were several poor quality and work performance issues (in which Plaintiff had made blood testing errors and for which Plaintiff had received Hospital-provided counseling); several examples of excessive absenteeism (for which Plaintiff was given warnings); inappropriate conduct (for which Plaintiff was given a verbal warning); and the falsification of a colleague's timecard (for which Plaintiff received a suspension). *See id.*

The formal discipline and termination of employment form that Defendant provided to Plaintiff also listed several "serious offenses" that had occurred in the month immediately prior to Plaintiff's termination:

- Continued absenteeism issues: 9/23-9/26/08

- Week of 9/28/08: Another occurrence of inappropriate conduct: Complaint received regarding comments that you made while at work that were extremely personal and sexual in nature.

- 9/30/08: You did not follow the procedure for checking pending logs resulting in a significant delay in patient care for a critical patient in [the Critical Care Unit]. When asked why you didn't check your pending log you replied "because I didn't."

- 10/1/08: While working in Hematology you were given samples to run for coagulation testing.  You combined two separate specimens into one and were unable to perform the testing on the samples due to the error.  These were Proficiency Testing (PT) samples and because of the error the Lab was unable to report the results resulting in unacceptable performance for this testing.  Had these been patient samples, the error could have had serious detrimental effects to patient care.  As these were Proficiency Testing samples, the error jeopardizes the ability of Windham Hospital Laboratory to perform these tests in the future.  This is the 2nd occurrence of an error made by you on PT samples for the same tests.  The first error occurred in 2007 and as a result the Lab was 'on probation' for these tests in 2007.  When the supervisor discussed the seriousness of the problem with you, you showed no

4

concern for your error.

- 10/06/08: You were given an unknown sample as a competency test in Blood Bank by the supervisor (as a follow-up to ... 8/5/08 performance issues). You failed to add the patient's blood to the cartridge and came up with incorrect results. These mistakes could seriously harm or kill a patient.

*Id.*  The accompanying letter Plaintiff received stated:

> ... You have had a number of performance and behavior issues over the past few years and these occurrences have increased in frequency and seriousness in the past year and include attendance, conduct, falsification of records, and performance.  There has been another complaint about the personal and sexual nature of your conversations while at work.  Such conversations are unprofessional and offensive.
>
> In addition, and the most critical issue, is the number of serious performance problems that recently occurred.  First was the Critical Care patient that took you over three hours to result because you did not follow procedures and check your pending logs.  This delay in testing prompted a review by Quality Management.
>
> In Hematology, you were given Proficiency Testing Samples to run.  You made a mistake by pouring two of the samples together.  Because of this error we were unable to report the results, which means we will fail this proficiency testing challenge and be on probation ... for the next two challenges.  We could potentially lose our ability to perform this testing due to this error.  In 2007 you made a similar error on the same tests and we were on probation then as well.  Even more concerning is the fact that these could have been patient samples.
>
> In Blood Bank you were given a competency test this week because of performance issues identified in August.  You forgot to add the patient serum and came up with incorrect results.  These mistakes could kill patients.  In all three of these performance issues you showed little concern for your mistakes....

*Id.* at 98.  Plaintiff has not disputed the facts as presented by Defendant in her termination forms.

Plaintiff brings four Counts against Defendant in her Complaint: Violation of the CFEPA for Disparate Treatment (Count One); Violation of the CFEPA for Failure to Accommodate (Count Two); Violation of the FMLA for Interference (Count Three); and Violation of the FMLA for Retaliation (Count Four).  Plaintiff's demand for relief includes reinstatement to her position at the Hospital, monetary damages, and statutory attorneys' fees.

5

III.    **Standard of Review**

The standards for summary judgment are familiar.  Summary judgment is appropriate when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law."  F. R. Civ. P. 56(c); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256 (1986).  The role of a district court in considering a motion for summary judgment is therefore "not to resolve disputed questions of fact but only to determine whether, as to any material issue, a genuine factual dispute exists." *In re Dana Corp.*, 574 F.3d 129, 151 (2d Cir. 2009).  The moving party, in this case the Defendant, bears the burden of showing that it is entitled to summary judgment.  Once it has satisfied this burden, in order to defeat the motion the party opposing summary judgment, in this case the Plaintiff, "must set forth specific facts demonstrating that there is a genuine issue for trial." *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir 2009) (internal quotation marks omitted).  A dispute about a genuine issue of fact exists for summary judgment purposes where the evidence is such that a reasonable jury could decide in the non-movant's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

In making its determination on a summary judgment motion, a trial court will resolve all ambiguities and draw all inferences in favor of the party against whom summary judgment is sought. Fed. R. Civ. P. 56(c); *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Loeffler v. Staten Island Univ. Hosp.*, 582 F.3d 268, 274 (2d Cir. 2009).  It is "[o]nly when reasonable minds could not differ as to the import of the evidence" that summary judgment is proper. *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir. 1991).  When "a motion for summary judgment is properly supported by documentary and testimonial evidence ... the nonmoving party may not rest upon the mere allegations or denials of his pleadings, but rather must present significant probative

6

evidence to establish a genuine issue of fact." *Marczeski v. Gavitt*, 354 F.Supp. 2d 190, 193 (D. Conn. 2005) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 327 (1986)).

In order to present a "genuine issue of material fact" the nonmoving party must therefore present contradictory evidence "such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 248.  Consequently the nonmoving party must present affirmative evidence in order to defeat a properly supported summary judgment motion.  As the "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment," *Id.* at 247-48, if the nonmoving party submits evidence that is "merely colorable," summary judgment may be granted.  *Id.* at 249-50.  In sum, a "complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex Corp. v. Catrett,* 477 U.S. at 322.

In the case at bar, this Court's subject matter jurisdiction depends primarily upon whether Plaintiff asserts valid factual claims under the FMLA.  The Court dismisses Plaintiff's two claims in order.

## IV.    FMLA Interference Claim

In Count Three of her Complaint, Plaintiff Amanda Nurse claims that Defendant interfered with her ability to take FMLA-protected "leave in that it denied her the right to take intermittent leave in the form of a temporary part-time leave schedule" upon her return from a two-month continuous FMLA leave in the summer of 2008.  Complaint, [Doc. 1] at ¶ 34.  "The FMLA contains prescriptive protections that are expressed as substantive statutory rights." *Gauthier v. Yardney Technical Prods., Inc.*, 2007 WL 2688854 at *4 (D. Conn. Sept. 13, 2007) (citation omitted).  Although Plaintiff does not cite a specific statutory section, an interference claim may be  brought

7

pursuant to 29 U.S.C. § 2615(a)(1), under which it is "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under" the FMLA. 29 U.S.C. § 2615(a)(1).

The Court construes the present Complaint as based upon that section of the statute. .

In order to establish an FMLA interference claim pursuant to 29 U.S.C. § 2615(a)(1), a plaintiff need prove that his or her employer "in some manner impeded the employee's exercise of [those rights which are] afforded substantive protection under the FMLA.  A plaintiff bears the burden of establishing only a prima facie case for interference claims, and the court need not entertain the issue of the employer's intent." *Gauthier v. Yardney Technical Prods., Inc.*, 2007 WL 2688854 at *4 (internal citations and quotation marks omitted); *see also Weichman v. Chubb & Son*, 552 F. Supp. 2d 271, 288 (D. Conn. 2008) (stating that for FMLA interference claims, a plaintiff "need only prove by a preponderance of the evidence that her taking of FMLA-protected leave constituted a negative factor in the decision to terminate her.") (quoting *Sista v. CDC Ixis North America, Inc.*, 445 F.3d 161, 175-76 (2d Cir. 2006)).

In order to make out a prima facie case for interference with FMLA-protected leave, a plaintiff must therefore demonstrate that: (1) the plaintiff is an eligible employee under the FMLA; (2) the defendant constitutes an employer under the FMLA; (3) the plaintiff is entitled to leave under the FMLA; (4) the plaintiff gave notice to the defendant of his or her desire to take an FMLA leave; and (5) the defendant denied the benefits to which the plaintiff was entitled under the FMLA. *Gauthier v. Yardney Technical Prods., Inc.*, 2007 WL 2688854 at *5.  A plaintiff may "prove this claim, as one might any ordinary statutory claim, by using either direct or circumstantial evidence, or both." *Weichman v. Chubb & Son*, 552 F. Supp. 2d at 288 (quoting *Sista v. CDC Ixis North*

*America, Inc.*, 445 F.3d at 175-76 ).

In the case at bar, Plaintiff is not claiming that Defendant interfered with her ability to take her initial FMLA leave, which commenced in June of 2008 and concluded two months later, in August 2008.  Indeed, the parties seem to be in agreement that Defendant properly granted Plaintiff's June 2008 FMLA leave request and that Defendants restored Plaintiff to her original position with no diminution in salary, benefits, or job prerequisites.  Rather, Plaintiff claims in that Defendant interfered with her rights under the FMLA when it denied her the opportunity to come back to work on a part-time basis as, Plaintiff avers in her briefing, was indicated by her physician.  Plaintiff's Opposition to Defendant's Motion for Summary Judgment, [Doc. 27] at 37.

At the outset, the Court notes that, despite Plaintiff's contention that part-time FMLA leave for the relevant period was indicated by her physician, the Court finds that this was not in fact the case.  It *is* the case that Plaintiff's physician, Dr. Michael Keenan of Coventry, Connecticut, stated in an April 2008[1] FMLA Health Care Provider Certification form that Amanda Nurse[2] was suffering from anxiety, depression, panic attacks, and migraines, and that it would be necessary for her to take work only *intermittently* as a result of her medical condition.  *See* [Doc. 27-17] at 2-3 (emphasis added).  In a June 2008 response to Plaintiff's request for FMLA intermittent leave, which presumably was made in conjunction with Plaintiff's submission of this April 2008 Certification

---

[1]  While the date given at the bottom of this form is April 28, 2007, it is appears evident both from the context of this form as well as a leave start date given elsewhere on this form that the date on which the form was filled out by Dr. Keenan was in fact April 28, 2008.  *See* [Doc. 27-17] at 2-3.

[2]  On this and several other relevant forms, Plaintiff, who underwent a divorce during the time period spanning relevant events, is referred to by her married name, Amanda Araujo.  For purposes of clarity and consistency, the Court will refer to Plaintiff solely as Amanda Nurse throughout this opinion.

form, Defendant Windham Hospital accordingly noted that Plaintiff has indicated that her FMLA leave "will be taken on an *intermittent* basis." [Doc. 27-17] at 5 (emphasis added). The Hospital also issued a response to Plaintiff's subsequent June 2008 request for continuous FMLA leave, in which Defendant noted that Plaintiff had in fact "taken some *intermittent* day[s] off under [her] intermittent FMLA" leave. [Doc. 27-17] at 9 (emphasis added). Further, in August of 2008, Dr. Keenan wrote that Plaintiff "may return" to work, and that at that point in time she had "*0 restrictions*." [Doc. 27-27] at 6 (emphasis added). Dr. Keenan's own patient notes, from this same time period, i.e., August of 2008, stated that Plaintiff Nurse would "return to *unrestricted duty* on 8/5/08." [Doc. 27-27] at 5 (emphasis added).

Notably, nowhere in any of the above-cited FMLA certification or leave forms or in any of Plaintiff's physician's notes that constitute part of the Record before this Court is there any explicit or implicit mention of *part-time* FMLA leave. Indeed, in her briefing, Plaintiff appears to conflate the entirely separate FMLA categories of "intermittent leave" and "reduced leave schedule." Both types of non-continuous leave are addressed at 29 C.F.R. § 825.202, a section of the FMLA subtitled "Intermittent leave *or* reduced schedule leave." (emphasis added). While the very use of the word "or" in § 825.202's subtitle indicates that there is a firm distinction between these two categories of FMLA leave, the text of the statute leave no doubt that these types of leave are separate and not to be conflated with one another. The section goes on to specify:

> *Intermittent leave is FMLA leave taken in separate blocks of time due to a single qualifying reason*.... [It] may be taken for a serious health condition[3] ... which requires treatment by a health care provider periodically, rather than for one continuous period of time, and may

---

[3] Under the FMLA, a "serious health condition" means "an illness, injury, impairment, or physical or mental condition that involves (1) inpatient care ...; or (2) continuing treatment by a health care provider." 29 C.F.R. § 825.113.

include leave of periods from an hour or more to several weeks.  Examples of intermittent leave would include leave taken on an occasional basis for medical appointments, or leave taken several days at a time spread over a period of six months....

29 C.F.R. § 825.202(a) and (b)(1) (emphasis added).    In contrast, the same FMLA section explicates:

> A *reduced leave schedule is a leave schedule that reduces an employee's usual number of working hours per workweek, or hours per workday*.  A reduced leave schedule is a change in the employee's schedule for a period of time, normally from full-time to part-time.... An example of an employee taking leave on a *reduced leave* schedule is an employee who is recovering from a serious health condition and is not strong enough to work a full-time schedule.

*Id.*  (emphasis added).

Plaintiff's briefs confuse and incorrectly equate these two distinct types of FMLA leave.  For example, her main brief states: "Plaintiff asked prior to her return for the opportunity to work on a *part-time basis*, thereby taking *intermittent FMLA leave*;" and, further, that "Plaintiff *would need 3-4 months of intermittent FMLA leave* to treat her depression.  Defendant *denied Plaintiff's request for an intermittent FMLA leave* when it *refused to allow her to return to work on a part[-]time basis*...." Plaintiff's Opposition to Defendant's Motion for Summary Judgment, [Doc. 27] at 36 (emphasis added).

One senses in Plaintiff's briefs the belief or impression that certain cases hold there is no distinction between intermittent and reduced leave schedules under the FMLA.  Thus, she cites *Ridings v. Riverside Medical Center*, 537 F.3d 755 (7th Cir. 2008) for the proposition that a plaintiff-employee's obligations under a defendant-employer's policies were essentially identical regardless of which type of FMLA leave (i.e., intermittent or reduced schedule) she was taking.  *See* Plaintiff's

Sur-Reply in Opposition to Defendant's Motion for Summary Judgment, [Doc. 35] at 10 (citing *Ridings v. Riverside Medical Center*, 537 F.3d 755). However, the part of that Seventh Circuit opinion to which Plaintiff is making reference is solely concerned with which *notice requirements and FMLA-related certification forms are necessary to give to an employer* when an employee is to take one type of FMLA leave as opposed to a different type of FMLA leave. A fuller citation of this section of the appellate court's holding makes this clear: "We conclude that [the plaintiff-employee's] *obligations* under [defendant-employer's] policies were also essentially identical regardless of which type of leave she was taking. *She would have filled out the same forms, checked the same boxes, and had the same obligations to provide medical certification*." *Ridings v. Riverside Medical Center*, 537 F.3d at 766 (emphasis added).

Plaintiff also cites *Collins v. U.S. Playing Card Co.*, 466 F. Supp. 2d 954 (S.D. Ohio 2006) – in which a diabetic plaintiff-employee was found to have given sufficient notice to invoke FMLA protection for the two times in which, due to what he claimed was a medical necessity, he left his workstation early in order to get something to eat. *See Collins v. U.S. Playing Card Co.*, 466 F. Supp. 2d at 965. However, nothing in the opinion rendered in *Collins v. U.S. Playing Card Co.* suggests that when possibly eligible for one type of non-continuous FMLA leave, a plaintiff-employee ought to be entitled to an entirely separate type of leave, particularly in a situation in which that plaintiff-employee's doctor has overtly stated that the plaintiff-employee may return to work with no restrictions. The Court therefore finds Plaintiff's reliance on this section of the FMLA to be misplaced.

Moreover, the text of the FMLA makes clear that for an employee to take "leave on a reduced leave schedule ... *there must be a medical need for [this reduced schedule] leave* and it must be that

such medical need can be best accomplished through" the reduced schedule leave.  29 C.F.R. § 825.202(b) (emphasis added).  The FMLA further specifies that the relevant medical "treatment regimen and other information described in the certification of a serious health condition" ought to address "the medical necessity of" an employee's leave on a reduced leave schedule.  *Id.*  While Plaintiff submitted multiple such Certification forms from her treating physician to Defendant, not one contained anything stating or suggesting that Plaintiff had any medical need for a reduced schedule leave under the FMLA.  On the contrary, as addressed *supra*, Plaintiff was *cleared to return to work on a full-time basis with no restrictions for the very time period in which she claims Defendants interfered with her right to take a reduced schedule leave under the FMLA.*[4]

In the case at bar, not only has Plaintiff not provided the Court with any evidence that her treating physician suggested or believed that she required a *reduced leave* (i.e., part-time) schedule, Plaintiff's physician *actually stated* that she was released to return to work in early August with "*0 restrictions*" on her hours, [Doc. 27-27] at 6 (emphasis added), and that, moreover, that she had been medically cleared to "return to *unrestricted duty* on 8/5/08."  *Id.* at 5 (emphasis added).  Further, to the extent that the intermittent leave which her physician had prescribed several months earlier – i.e., prior to clearing her for returning to work full time and without any restrictions – was even still applicable or relevant, as discussed *supra* the FMLA explicitly distinguishes between such intermittent leave and the part-time schedule to which Plaintiff claims she was entitled and of which Plaintiff claims she gave notice through a discussion with her supervisor at the Hospital, Kim

---

[4]  Further, as discussed *supra*, even to the extent that Plaintiff remained eligible for intermittent FMLA leave despite having been cleared by her treating physician to return to work with no restrictions, intermittent leave is an entirely separate sort of leave from reduced schedule leave with its own separate eligibility criteria.

Ninteau, something which Ninteau disputes in her own deposition. That factual dispute, while clearly extant, is irrelevant and immaterial to the Court's determination of the case. The Court need not (and therefore does not) reach it in order to find that even in a light most favorable to the Plaintiff, the facts do not and cannot support a prima facie claim for FMLA interference. Even if it *were* true that Plaintiff had made this request of Ninteau exactly as Plaintiff describes, it is still evident that Plaintiff's physician felt that there was no medical need for Plaintiff to work on a specifically reduced schedule, or part-time, basis.

Given the facts and evidence with which the Court has been provided, and examining and interpreting them in a light most favorable to Plaintiff, the Court nonetheless finds that Plaintiff does not and cannot demonstrate three of the five elements necessary to make out a prima facie claim for interference with FMLA leave. Specifically, Plaintiff cannot demonstrate that: (1) she was entitled to a reduced schedule leave under the FMLA for the relevant time period; (2) that she gave notice to Defendant of a medically well founded desire to take such leave; or (3) that Defendant denied Plainitff benefits to which she was entitled under the FMLA.

To state the case in the language of summary judgment analysis: On the evidence in the record, no reasonable jury could find that Plaintiff had established these essential elements of a claim for FMLA interference. Accordingly, Defendant is entitled to summary judgment dismissing Count Three of the Complaint.

## V.    FMLA Retaliation Claims

In Count Four of her Complaint, Plaintiff claims that "Defendant retaliated against her for taking [FMLA] protected leave in that it terminated her for protected personal absences." Complaint [Doc. 1] at ¶36. The linchpin of this claim is the fact that, when Plaintiff was terminated from

employment at the Hospital on or around October 10, 2008, she was "provided with a termination document which included alleged justifications for her discharge" (quoted extensively *supra* in the Background and Facts section), which included the offense of "continued absenteeism issues: 9/23- 9/26-08." *Id.* at ¶¶26-27; *see also* [Doc. 21-4].    Plaintiff claims that this September 2008 absence, which she reports was due to "lyme disease"-like symptoms, was protected under the FMLA.  [Doc. 1] at ¶23.    Plaintiff also seems to argue that she was fired in part for the continuous FMLA leave she took between late June 2008 and early August 2008, for which she claims she was disciplined on "her first day of work" back at the Hospital.  Plaintiff's Opposition to Defendant's Motion for Summary Judgment [Doc. 27] at 38.

The FMLA provides certain levels of job security to eligible employees who take leave from their jobs for serious health conditions.  Under the statute, an employer cannot "use the taking of FMLA leave as a negative factor in employment actions, such as hiring, promotions or disciplinary actions."  29 C.F.R. § 825.220(c); 29 U.S.C. § 2615; *see also, e.g., Worster v. Carlson Wagon Lit Travel, Inc.*, 353 F.Supp. 2d 257, 272 (D. Conn. 2005) ("An employer is prohibited from disciminating against employees ... who have used FMLA leave ... Nor may employers use the taking of FMLA leave as a negative factor in employment decisions, such as hiring, promotions or disciplinary actions.") (internal quotation marks and citations omitted).  The FMLA defines a "serious health condition" to mean "an illness, injury, impairment, or physical or mental condition that involves (1) inpatient care ...; or (2) continuing treatment by a health care provider."  29 C.F.R. § 825.113.  The statute considers continuing treatment by a health provider to include:

> [A] period of incapacity [i.e., inability to work ... due to the serious health condition, treatment therefor, or recovery therefrom] of more than three consecutive, full calendar days, and any subsequent treatment or period of incapacity relating to the same condition, that also

15

involves: (1) [t]reatment two or more times ... by a health care provider ...; or (2) [t]reatment by a health care provider on at least one occasion, which results in a regimen of continuing treatment under the supervision of the health care provider...."

29 C.F.R. § 825.115. The FMLA also protects employees who must take leave due to "chronic conditions," which it defines as conditions which require "periodic visits ... for treatment by a health care provider" that continue "over an extended period of time" and that "[m]ay cause episodic rather than ... continuing period[s] of incapacity." 29 C.F.R. § 825.115(c).

In this Circuit, courts "analyze retaliation claims brought pursuant to the FMLA under the burden-shifting test set forth in [the United States Supreme Court ruling in] *McDonnell Douglas Corp. v. Green*."[5] *Roberts v. Health Ass'n,* 308 Fed. Appx. 568, 570 (2d Cir. 2009). Under the *McDonnell Douglas* burden-shifting methodology set forth by the Supreme Court, in order to make out a prima facie case that she was retaliated against for exercising her rights under the FMLA, Plaintiff must present proof sufficient to establish several elements: specifically, that (1) she exercised rights protected under the FMLA; (2) she was qualified for her position; (3) she suffered an adverse employment action; and (4) the adverse employment action occurred under circumstances giving rise to an inference of retaliatory intent.[6] *Potenza v. City of New York,* 365 F.3d 165, 168 (2d

---

[5] 411 U.S. 792 (1973).

[6] As the Second Circuit has noted, "[c]lose temporal proximity between the plaintiff's protected action and the employer's adverse employment action may in itself be sufficient to establish the requisite causal connection between a protected activity and retaliatory action." *Kaytor v. Electric Boat Corp.*, 609 F.3d 537, 552 (2d Cir. 2010) (citing *Clark County School District v. Breeden*, 532 U.S. 268, 273 (2001); *Cifra v. General Electric Co.*, 252 F.3d 205, 217 (2d Cir. 2001)). However, as the Second Circuit has also recently noted, "without more, such temporal proximity is insufficient to satisfy [a plaintiff's] burden to bring forward some evidence of pretext. Indeed, a plaintiff must come forward with some evidence of pretext in order to raise a triable issue of fact." *El Sayed v. Hilton Hotels Corp.*, 627 F.3d 931, 933 (2d Cir. 2010) (citations omitted).

Cir. 2004) (applying and stating that it is appropriate to apply the *McDonnell Douglas* analysis to

claims of FMLA retaliation); *see also, e.g., Spano v. Gengras Motor Cars, Inc.*, 663 F.Supp. 2d 75,

80 (D. Conn. 2009) ("FMLA discrimination claims are governed by the McDonnell Douglas

standard.").

If "the plaintiff has met this burden of establishing a prima facie case (which is generally not

understood by courts to be onerous)," under the *McDonnell Douglas* methodology the defendant

must merely *"articulate* (not *prove*), via admissible evidence, a legitimate reason for the employment

decision.... At that point, the plaintiff must have the opportunity to demonstrate that the employer's

proffered reason was not the true reason for the employment decision," which may be accomplished

"either by persuading the trier of fact that a discriminatory reason more likely than not motivated the

employer, or by persuading the trier of fact that the employer's proffered explanation is unworthy of

belief." *Tyler v. Bethlehem Steel Corp.*, 958 F.2d 1176, 1180-81 (2d Cir. 1992) (internal quotation

marks and citations omitted) (emphasis in original); *see also Weichman v. Chubb & Son*, 552 F.

Supp. 2d 271, 289-90 (D. Conn. 2008) (applying *McDonnell Douglas* analysis to FMLA retaliation

claim).

Applying this analytical framework to summary judgment standards in antidiscrimination

cases, the Second Circuit has noted:

> At the summary judgment stage, if the plaintiff presents at least a minimal amount of
> evidence to support the elements of the claim, the burden of production shifts to the
> defendant to proffer a legitimate non-retaliatory reason for the adverse employment action.
> If the employer produces such evidence, the employee must, in order to avoid summary
> judgment, point to evidence sufficient to permit an inference that the employer's proffered
> non-retaliatory reason is pretextual and that *retaliation was a substantial reason* for the
> adverse employment action.

*Kaytor v. Electric Boat Corp.*, 609 F.3d 537, 552-53 (2d Cir. 2010), (emphasis added) (quoting *Jute*

17

*v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 173 (2d Cir. 2005)), (internal quotation marks and citations omitted).

As this Circuit has emphasized in the past, "courts [have] recognized that more than one reason can motivate an employer's adverse action"; thus, when applying a *McDonnell Douglas* analysis, courts have "said that [a] plaintiff had to prove" under the third prong of the analysis that the allegedly "impermissible reason, even though not the only reason for an adverse employment decision, was a 'substantial' or 'motivating' factor," or, at the least, "'made a difference' in the decision." *Fields v. New York State Office of Mental Retardation and Developmental Disabilities*, 115 F.3d 116, 120 (2d Cir. 1997) (in discussing the application of the *McDonnell Douglas* analysis to an adverse employment discrimination claim arising under Title VII) (quoting *Sherkow v. Wisconsin*, 630 F.2d 498, 502 (7th Cir. 1980), *Ramseur v. Chase Manhattan Bank*, 865 F.2d 460, 465 (2d Cir. 1989) and citing *cf. Paolillo v. Dresser Industries, Inc.*, 865 F.2d 37, 40 (2d Cir. 1989), *as amended,* 884 F.2d 707 (2d Cir. 1989) (addressing this standard as it applies to a court's *McDonnell Douglas* analysis of alleged discrimination under the ADEA)); *see also, e.g., Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166 (same).

It is well settled that the "FMLA is not a shield to protect employees from legitimate disciplinary action by their employers if their performance is lacking in some manner unrelated to their FMLA leave." *Basso v. Potter*, 596 F. Supp. 2d 324, 336n.4 (D. Conn. 2009) (quoting *Geromanos v. Columbia Univ.*, 322 F.Supp.2d 420, 429 (S.D.N.Y. 2004)); *see also, e.g., Sista v. CDC Ixis North America, Inc.*, 445 F.3d 161, 175 (2d Cir. 2006) (quoting same). As such, the statute does not prevent an employee's "termination following the completion of his leave where ... defendants articulate a nonpretextual reason for his removal based on events which occurred prior

18

to his going on leave." *Hale v. Mann*, 219 F.3d 61, 66 (2d Cir. 2000) (citation omitted).  In short, the FMLA "gives no greater job security than that to which the employee would have been entitled prior to taking leave." *Id.*  (citation omitted).

Consequently, if a "plaintiff present[s] evidence to prove that the impermissible reason was at least in part a motivating factor for the adverse decision, *the defendant ha[s] the option of attempting to prove, as an affirmative defense, that it would have taken the same action for the permissible reason alone*."  *Fields v. New York State Office of Mental Retardation and Developmental Disabilities*, 115 F.3d at 120 (emphasis added).  Alternately, "the defendant could decline this option and argue to the fact-finder that the plaintiff had failed to prove that the impermissible reason was even in part a motivating factor." *Id.*

In the case at bar, however, these questions of motivation and pretext do not furnish the grounds for decision.  That is because on this record, Plaintiff would not be able at trial to establish a prima facie case of FMLA retaliation.  Assuming without deciding that Plaintiff could establish the other elements, she could not prove the second: that she was "qualified for her position" of a medical laboratory technician.  The question of whether a particular individual is "qualified" for a particular job is fact-intensive and depends upon the circumstances.   As the Second Circuit noted over thirty years ago, the "particular qualification of a job must of necessity vary with the occupation and the type of employer.  Qualifications for a job to work as a mechanic for a manufacturer ... are more easily measured and quantified than qualifications to hold a faculty position at a university." *Powell v. Syracuse University*, 580 F.2d 1150, 1157 (2d Cir. 1978).

The question of whether a particular individual is qualified to perform a particular job runs like a *leitmotif* through cases construing civil rights statutes.  FMLA is one such statute; the

Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq* ("ADA") is another.  Cases under both statutes use *McDonnell Douglas* analysis; and I find ADA-case definitions instructive in this FMLA case.  The Second Circuit has a string of them.  "Under the ADA, an individual is qualified for a job if he can perform its essential functions." *Colby v. Pye & Hogan LLC*, 602 F. Supp. 2d 365, 371 (D. Conn. 2009) (citing *Shannon v. New York City Transit Auth.*, 332 F.3d 95, 99-100 (2d Cir. 2003)). While the term "essential functions" is not itself defined in the ADA, it is "defined in ADA regulations promulgated by the Equal Employment Opportunity Commission [hereafter "EEOC"] generally to mean the 'fundamental' duties of the position in question, but not functions that are merely 'marginal'." *Colby v. Pye & Hogan LLC*, 602 F. Supp. 2d at 365 (quoting *Mitchell v. Washingtonville Cent. School Dist.,* 190 F.3d 1, 8 (2d Cir. 1999)); 29 C.F.R. § 1630.2(n)(1); *see also Peters v. Sikorsky Aircraft Corp.,* 2006 WL 2331077 at *8 (D. Conn. Aug. 10, 2007).[7]  In determining which duties are "fundamental," the Second Circuit accords "considerable deference to an employer's judgment." *D'Amico v. City of New York*, 132 F.3d 145, 151 (2d Cir. 1998).

The EEOC regulations promulgated under the ADA list three factors to be considered in determining whether a job duty constitutes an "essential function": (1) whether "the reason that the position exists is to perform that function"; (2) whether there are a "limited number of employees available among whom the performance of that job function can be distributed"; and/or (3) whether "[t]he function [is] highly specialized so that the incumbent in the position is hired for his or her expertise or ability to perform the particular function." 29 C.F.R. § 1630.2(n)(2); *see also Martinsky*

_____

[7]  In the Second Circuit, because the EEOC "is the agency that bears the responsibility for implementing specific provisions of the ADA," *Martinsky v. City of Bridgeport*, 814 F.Supp. 2d 130, 141-42 (D. Conn. 2011), its regulations are entitled to 'great deference' in interpreting the ADA." *Muller v. Costello*, 187 F.3d 298, 312 (2d Cir. 1999) (quoting *Reeves v. Johnson Controls World Servs.*, 140 F.3d 144, 150n.3 (2d Cir. 1998)).

*v. City of Bridgeport*, 814 F.Supp. 2d 130, 145 (D. Conn. 2011) (quoting same).

Under the EEOC regulations, evidence that may appropriately be considered in evaluating whether a job function is essential include "the employer's judgment as to which functions are essential," as well as "the consequences of not requiring the incumbent to perform the function." 29 C.F.R. § 1630.2(n)(3)(i) and (iv);  *see also Martinsky v. City of Bridgeport*, 814 F.Supp. 2d at 146 (quoting same).  This Circuit has made clear that the employer's judgment, written job descriptions, the amount of time spent on the job performing the function, the consequences of not requiring plaintiff to perform the function, mention of the function in any collective bargaining agreement, the work experience of past employees in the job, and the work experience of current employees in similar jobs are all appropriately taken into account in an analysis as to whether a job function is "essential."  *See Stone v. City of Mount Vernon*, 118 F.3d 92, 97 (2d Cir. 1997).  In its analysis and application of these considerations, this Circuit has noted that they "are fact-intensive," that "[u]sually no one listed factor will be dispositive," and, moreover, that the "regulations themselves state that the evidentiary examples provided are not meant to be exhaustive."  *Id.*   While the ADA-EEOC regulations do not apply to this FMLA case *ex proprio vigore*, they derive from the same practical and pragmatic considerations, and I find them to be instructive in this case.

As the Second Circuit has also recently noted, "another indicator of whether a particular [job] function is essential" is the nature of the "consequences of failing to require [an] employee to perform" it.  *Price v. City of New York*, 264 Fed. Appx. 66, 69 (2d Cir. 2008) (quoting 29 C.F.R.§ 1630, App. § 1630.2(n)).  "For example, although a firefighter may not regularly have to carry an unconscious adult out of a burning building, the consequence of failing to require the firefighter to be able to perform this function would be serious," and, consequently, a "court must give

21

considerable deference to an employer's judgment regarding what functions are essential for service in a particular position." *Id.* (quoting *Shannon v. New York City Transit Auth.*, 332 F.3d 95, 99 (2d Cir. 2003)); *see also D'Amico v. City of New York*, 132 F.3d 145, 151 (2d Cir. 1998) (stating that courts "must give considerable deference to an employer's judgment regarding what functions are essential for service in a particular position.").[8]

The rule in this Circuit is that "a plaintiff complaining of discriminatory discharge shows 'qualification' by demonstrating satisfactory job performance, in accordance with the particular employer's criteria for satisfactory job performance." *Sista  v. CDC Ixis North America, Inc.*, 445 F.3d 161,172 (2d Cir. 2006) (citation and internal quotation marks omitted).  I apply that rule to the case at bar,  where Plaintiff Nurse is opposing Defendant Hospital's motion for a summary judgment holding that its termination of Plaintiff was justified.  The decisive question is whether Plaintiff has presented contradictory evidence of such quality "that a reasonable jury could return a verdict for the non-moving party," *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986), or to restate the question: On the record evidence in this case, could a reasonable jury, properly instructed in the law by the trial judge, find that Plaintiff Amanda Nurse was qualified for the position of medical laboratory technician on October 10, 2008, the date when Defendant Windham Community Memorial Hospital terminated her employment?  At a trial, Plaintiff would have the burden of proof on this core issue.

---

[8]   As the Seventh Circuit noted in a case concerning allegedly discriminatory behavior under the ADA and Rehabilitation Act in which it found that a postal employee who, among other things, "repeatedly missed work without permission" had consequently "failed to perform the essential functions of her job," the court reiterated its position that "when the evidence demonstrates that an employee is incapable of performing the job, the employer need not isolate the disability-related causes for an employee's inferior performance from problems that stem from a poor attitude, insubordination, carelessness, or outright disregard for the safety of himself and his co-workers." *Garg v. Potter*, 521 F.3d 731, 737 (7th Cir. 2008) (quoting *Hammel v. Eau Galle Cheese Factory*, 407 F.3d 852, 865 (7th Cir. 2005)).

It is not an easy matter for lay jurors, or for lay judges at the summary judgment stage, to evaluate the job qualifications of individuals in another profession, such as medicine. Judges instruct jurors to treat that question with the utmost care and seriousness, and judges do the same. In this case, I do not doubt the sincerity of Plaintiff's personal conviction that her termination was wrongful. Nor do I doubt that in terminating Plaintiff, the Hospital administrators acted out of a conviction that the needs of the Hospital and its patients made that termination appropriate.  In a case such as this, the function of a trial judge at the summary judgment stage is to consider all the evidence elicited during discovery – extensive in this case – and then determine whether at a trial,

the Plaintiff could sustain her burden of persuading a *reasonable* jury that she was a *qualified* medical laboratory technician.  A "reasonable jury" is the phrase used by the Supreme Court in *Anderson v. Liberty Lobby*: it means a jury which accepts the governing law as explained by the trial judge, and then finds the facts on the basis of the evidence in the record, or the lack of evidence.  It is unacceptable for a jury to do otherwise, as the Second Circuit noted with some asperity in *Vandenbroek v. PSEG Power, CT LLC*, 356 Fed. Appx. 457, 461 (2d Cir. 2009): "a jury would have to engage in impermissible speculation to conclude that PSEG terminated plaintiff in retaliation for taking FMLA-protected leave.  We therefore conclude that the district court properly entered summary judgment in favor of PSEG on plaintiff's FMLA claim."

In the case at bar, I have carefully considered the evidence on the question presented, in the light of the cited Second Circuit precedents and rules.  I am constrained to hold that a reasonable trial jury would be unable to find that Plaintiff was a qualified MLT at the time Defendant terminated her. Much of the evidence compelling that conclusion has been discussed *supra*.  These additional observations may be made.

Defendant has stated, plausibly and without contradiction, that medical testing of laboratory specimens "is an *essential component* of the services provided by the Hospital, an acute care facility located in Willimantic, Connecticut," and that to "facilitate the expeditious testing of patient specimens, the Hospital maintains [the] on-site laboratory" for while Plaintiff worked. Memorandum in Support of Defendant's Motion for Summary Judgment, [Doc. 20] at 3 (emphasis added). In her position in the laboratory, Defendant states that "[P]laintiff was responsible for, *inter alia*, processing specimens, reporting test results, performing quality control tests, and maintaining Lab equipment in proper working order." *Id.* Thus, given the facts in evidence concerning mistakes Plaintiff made in running various lab tests, may of which are described *supra*, including a mistake that resulted in a serious injury to a Hospital patient, causing internal bleeding, and several other mistakes that could have resulted in similarly serious injuries had they not been caught, a reasonable jury would conclude that Plaintiff was in fact not qualified for the job. On the evidence in the record, it would be unreasonable to conclude otherwise.[9]

---

[9] On this aspect of the case, the Second Circuit's opinion in *Vandenbroek v. PSEG Power CT LLC*, 356 Fed.Appx. 457 (2d Cir. 2009), is of interest. That case, which primarily involved the ADA, was not officially reported and I do not regard it as precedential. However, the court of appeals' discussion of the sometimes complex question of qualification for a particular job, in the context of federal anti-discrimination statutes, is instructive. The plaintiff was a boiler utility operator at defendant's power plant. Defendant terminated plaintiff because he posed a risk of recurring absenteeism caused by alcoholism, an "impairment" recognized as disabling by the ADA. Plaintiff claimed that his termination violated the ADA. The district court granted summary judgment to defendant. The court of appeals affirmed, reasoning that plaintiff had not established a *prima facie* ADA claim because he could not show that he was "otherwise qualified" for that particular job. The Second Circuit said:

> [W]e conclude that reliable attendance at scheduled shifts was an essential function of a boiler utility operator at the Bridgeport Harbor Station Power Plant. While "regularly attending work" is an essential function of virtually every job, it was especially important to plaintiff's job, where employees had to be present at the plant to monitor the boiler and respond to any alarms. Reliable employee

Since Plaintiff's qualification for the position of medical laboratory technician is a necessary element of her FMLA retaliation claim, this is a case where a "complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

To expand the present discussion somewhat: Given the facts that have been placed into evidence in the case at bar, including the undisputed facts listed *supra* which were relayed by Defendant in a termination form to Plaintiff, explicating the reasons behind its decision to terminate her employment at the Hospital, the Court finds that Defendant has had, and would have, no difficulty articulating a legitimate reason for its decision to terminate Plaintiff's employment, despite the fact that her possibly FMLA-protected September absence was undisputedly listed among those factors that Defendant took into consideration in its decision to let her go – and, as well, despite Plaintiff's claims that she was scolded for her mid-2008 FMLA-related absence.

As discussed *supra,* when a "plaintiff present[s] evidence to prove that the impermissible reason was at least in part a motivating factor for the adverse decision, the defendant ha[s] the option of attempting to prove, as an affirmative defense, that it would have taken the same action for the permissible reason alone." *Fields v. New York State Office of Mental Retardation and*

---

attendance was thus essential to ensuring against a power outage or even an explosion. . . . Plaintiff adduced no evidence that would permit a reasonable jury to find that PSEG could rely on him to appear for his shifts at the time he was terminated. . . . On this record, a jury could not reasonably infer that plaintiff was otherwise qualified for the boiler utility operator position at the time of his termination.

356 Fed.Appx. at 460 (citations and internal quotation marks omitted).  The particular and serious hazards posed by a boiler operator's absenteeism are analogous to a medical laboratory technician's failure to perform testing with care and skill, with its attendant hazards of a patient's death or loss of a hospital's accreditation.

*Developmental Disabilities*, 115 F.3d 116, 120 (2d Cir. 1997).  Moreover, also as discussed *supra*, "courts have recognized that more than one reason can motivate an employer's adverse action" and thus, when applying a *McDonnell Douglas* analysis, they have held that a "plaintiff had to prove that an impermissible reason, even though not the only reason for an adverse employment decision, was a 'substantial' or 'motivating' factor," or, at the least, "'made a difference' in the decision."  *Id.* (internal quotation marks and citations omitted).

In the case at bar, and for many of the same reasons for which the Court concludes that Plaintiff could prevail in making out a *prima facie* claim of retaliation due to her inability to demonstrate that she was qualified for the MLT job, the Court considers it implausible that, given Plaintiff's numerous blood testing errors, one of which causes severe internal bleeding in a patient and two of which put at risk the Hospital's own accreditation in areas specific to her job function, not to mention Plaintiff's inappropriate behavior and comments, and Plaintiff's signing another employee's name on that employee's timecard, no reasonable fact-finder or jury could find that Defendant did not have more than sufficient reason to terminate Plaintiff's employment.  Put another way, were the absences at issue never mentioned in the list of reasons for which Plaintiff's employment was being terminated, there would be no cause to question whether there was both sufficient and ample cause for the termination.

As previously stated, the Court does not question the sincerity with which Plaintiff has brought her claim of FMLA retaliation against Defendant, or the upset or difficulty that her termination from the Hospital has caused her.  However, even viewing all of the submitted evidence in a light most favorable to Plaintiff, as this Court is required to do under the standards for summary judgment, the Court concludes that Plaintiff, in opposing Defendant's motion for summary judgment,

has not shown the existence of any genuine issue of material fact which a reasonable jury could resolve in her favor and thereby uphold her FMLA retaliation claim.  Accordingly, Defendant is entitled to summary judgment as a matter of law, dismissing the Fourth Count of the Complaint for FMLA retaliation.

## VI.   Plaintiff's State Law Claims

In addition to Plaintiff's federal law FMLA claims, Plaintiff also brings two Connecticut state law claims in her Complaint: violation of the CFEPA through disparate treatment (at Count One); and violation of the CFEPA through failure to accommodate (at Count Two).  Complaint [Doc 1] at ¶¶ 30-33.  While Plaintiff cites to federal ADA-related law in her briefing, and while it is true that "Connecticut courts review federal precedent concerning employment discrimination for guidance in enforcing [Connecticut's] own anti-discrimination statutes," *Brown v. City of Waterbury Board of Education*, 722 F. Supp. 2d 219, 228 (D. Conn. 2010) (citation omitted),[10] *Plaintiff has not at any point not made a discrimination claim under the ADA.*

As Judge Kravitz noted several months ago, "this Court is reluctant to exercise supplemental jurisdiction in non-diversity cases," *Bellamy v. General Dynamics Corp.*, 2012 WL 1987171 at *7 (D. Conn. June 4, 2012), given that under 28 U.S.C § 1367(c) and (c)(3), United States "district courts may decline to exercise supplemental jurisdiction over a claim" if they have "dismissed all claims over which [they] ha[d] original jurisdiction."  28 U.S.C. § 1367(c) and (c)(3) (cited in

---

[10]   Connecticut courts have repeatedly held that Connecticut's antidiscrimination statutes, including the CFEPA, should be interpreted "in accordance with federal antidiscrimination laws." *Curry v. Allan S. Goodman, Inc.*, 286 Conn. 390, 407 (2008); *see also Hall v. Family Care Home Visiting Nurse and Home Care Agency, LLC*, 696 F. Supp. 2d 190, 198 (D. Conn. 2010) (quoting and applying same); *Levy v. Comm'n on Human Rights and Opportunities*, 236 Conn. 96, 103 (1996).

*Bellamy v. General Dynamics Corp.*, 2012 WL 1987171 at *7).

In recently citing and interpreting 28 U.S.C.A. § 1367(c) and (c)(3), the Second Circuit noted that, "[a]lthough federal courts may exercise jurisdiction over related state-law claims where an independent basis of subject-matter jurisdiction exisits, such a court may, for various reasons, nonetheless" decline to do so.  *Oneida Indian Nation of New York v. Madison County*, 665 F.3d 408, 436 (2d Cir. 2011) (internal citation omitted).  The Second Circuit explicated:

> Although the decision whether to decline to exercise supplemental jurisdiction is 'purely discretionary,' that discretion is, of course, subject to boundaries.  For example, we have repeatedly said that 'if a plaintiff's federal claims are dismissed before trial, the state law claims should be dismissed as well.'

*Id.* at 437 (internal citations and some quotation marks omitted) (quoting *Carlsbad Tech., Inc. v. HIF Bio, Inc.*, 556 U.S. 635 (2009) and *Brzak v. United Nations*, 597 F.3d 107, 113-114 (2d Cir. 2010)).

Thus, as Judge Kravitz demurred to do in *Bellamy v. General Dynamics Corp.*, this Court will not evaluate either of Plaintiff's CFEPA claims in the case at bar.  *See, e.g., Bellamy v. General Dynamics Corp.*, 2012 WL 1987171 at *7.  The Court does, however, question whether Plaintiff could effectively state a CFEPA claim on the evidence provided in the Record, for, along with other reasons, issues and facts presented concerning Plaintiff's eligibility and qualifications for the job she held at the Hospital.  However, as did Judge Kravitz in *Bellamy v. General Dynamics Corp.*, this Court leaves such an inquiry and determination to the state courts.

## VII.   Conclusion

For the forgoing reasons, Defendant's Motion for Summary Judgment [Doc. 19] is GRANTED with respect to Counts Three and Four of the Complaint.  These are the federal claims.  The Clerk is directed to dismiss those Counts with prejudice and without costs.

28

As for the Counts One and Two, these are state law claims and the Court declines to accept jurisdiction over them.  The Clerk is directed to dismiss those Counts without prejudice and without costs.

The Clerk is then directed to close the case.

It is SO ORDERED.

Dated:  New Haven, Connecticut
         December 28, 2012


                                        */s/ Charles S. Haight, Jr.*
                                        Charles S. Haight, Jr.
                                        Senior United States District Judge